IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ALEXANDRA SIMS                                                                                PLAINTIFF

v.                                            No. 4:13CV00371 JLH

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY                                                                          DEFENDANT

**OPINION AND ORDER**

Alexandra Sims commenced this action against State Farm Mutual Automobile Insurance Company, alleging that State Farm committed breach of contract, first-party bad faith, and a violation of the Arkansas Deceptive Trade Practices Act by failing to pay the limits of her underinsured motorist policy after she was injured in an accident caused by an underinsured tortfeasor. State Farm has moved for summary judgment on Sims's bad faith and deceptive trade practices claims. For the reasons explained below, the motion is granted.

**I.**

On January 10, 2008, an underinsured motorist negligently rear-ended a vehicle driven by Sims, who at that time was 17 years old. Sims was taken to the emergency room, where she complained of head and neck injuries. A cervical x-ray was negative, but she was instructed to follow up with her primary care physician if her conditions did not improve. One week later, Sims consulted her primary care physician at Cabot Medical Clinic for ongoing neck pain and headaches. Her physician diagnosed her with neck sprain and prescribed medication and physical therapy. Sims underwent physical therapy at the North Metro Physical Rehabilitation Center from January 21 to February 26, 2008. On March 26, 2008, Sims consulted a physical therapist at Ortho Arkansas, complaining of ongoing pain and tenderness. Sims's physical therapist performed a cervical x-ray, which was normal. He also determined that Sims had full range of motion in her cervical spine. He

recommended medication, preventative maintenance of her neck injury, and x-rays if there was no improvement. On May 28, there had been no change in Sims's condition. Therefore, on June 8, 2008, Sims underwent an MRI of the cervical spine. That MRI turned out to be negative.

On September 26, 2008, Sims sought chiropractic treatment, complaining of progressively worsening headaches over the previous few months. Sims was diagnosed as having muscle spasms in her cervical and upper thoracic spine and a diminished range of movement in the cervical spine. A Proton Density MRI was performed, which showed a grade 2 ligament and membrane tear at the occipital C1 level. It was determined that Sims had suffered permanent ligament damage and that future treatment would be required. Sims was assessed as having suffered a 28% whole person impairment due to her cervical spine ligament damage. Sims continued seeking chiropractic care with a different chiropractor after she moved to Russellville, Arkansas, to attend college.

The motorist who caused the accident with Sims had an automobile insurance policy with bodily injury limits of only $50,000 per person. Sims settled her claim against him for his liability limits of $50,000. State Farm consented to the settlement. Sims then made an underinsured motorist claim for coverage under her policy with State Farm, which included underinsured motorist liability coverage in the amount of $100,000 per person. Sims requested payment at the $100,000 policy limits. State Farm claims representative Dean Ripley investigated Sims's claim. Sims's claim file contained, among other things, medical records from 11 different providers who provided treatment between January 2008 and October 2012. Ripley sought a review of the records by a State Farm injury claim trainer to clarify the nature of Sims's injury and appropriate treatment regimens for that injury.

After receiving clarification from the injury claim trainer, Ripley had further questions about Sims's injury. Ripley's Team Manager, Oscar Rodriguez, instructed Ripley to send a letter to one of Sims's chiropractors for more information. After receiving information from the chiropractor, Ripley was still not satisfied, and he recommended that State Farm conduct a utilization review, a process in which the insured individual's treatment records and bills are reviewed by a provider of the same sort of services that were provided to the insured. Rodriguez asked Ripley whether the chiropractor had answered Ripley's questions. Ripley replied that in general his questions were answered. Rodriguez then instructed Ripley to evaluate Sims's claim based on the information State Farm had at that time.

Ripley evaluated Sims's claim to include past pain and suffering, estimated at a range of $35,000 to $45,000; past medical bills at $21,297.12; future medical bills at a range of $30,000 to $40,000; and future wage loss at a range of $30,000 to $45,000, for a total in the range of $116,297.12 to $151, 297.12. Ripley allowed no amount for future pain and suffering. Subtracting the $50,000 Sims received in a settlement from the motorist who caused the accident, the total came to a range of $66,297.12 to $101,297.12.

Ripley requested authority from his team manager, Oscar Rodriguez, to settle Sims's claim for $99,786.72. Rodriguez determined that, in his view, a sympathetic jury would value Sims's claim at a maximum of $100,000. Because Sims had already received $50,000 from the motorist who caused the accident, Rodriguez granted Ripley authority to settle Sims's claim up to $50,000. Five months after Sims filed her claim, Ripley made a settlement offer to Sims of $25,000. Through her attorney Sims rejected the offer and asked for an explanation of it. Ripley replied that most of Sims's treatment had occurred in 2008 and that there was no indication that her treatment was

3

ongoing. Sims provided an updated summary of medical bills and updated records for the several months that her claim had been pending with State Farm. Sims further pointed out that, of Sims's 125 medical visits related to the accident, 93 were in 2009 or later. Ripley subsequently increased the offer to $35,000. Sims rejected that offer and brought this action.

## II.

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact is presented only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record. *Spencer v. Jackson Cnty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013). If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

## III.

The Arkansas Supreme Court set forth the elements of a first-party bad faith claim in *Aetna Casualty & Surety Company v. Broadway Arms Corporation*, 281 Ark. 128, 664 S.W.2d 463 (1984):

> [I]n order to be successful a claim based on the tort of bad faith must include affirmative misconduct by the insurance company, without a good faith defense, and . . . the misconduct must be dishonest, malicious, or oppressive in an attempt to avoid its liability under an insurance policy. Such a claim cannot be based upon good faith denial, offers to compromise a claim or for other honest errors of judgment by the insurer. Neither can this type [of] claim be based upon negligence or bad judgment so long as the insurer is acting in good faith.

*Id.* at 133, 664 S.W.2d at 465; *see* Ark. Model Jury Instr., Civil, AMI 2304 (2015). Furthermore,

> a mistake on an insurance carrier's part or negligence or confusion or bad judgment will not suffice to substantiate the tort of bad faith. *See, e.g.*, *Southern Farm Bureau Cas. Ins. v. Allen*, 326 Ark. 1023, 934 S.W.2d 527 (1996); *Parker v. Southern Farm Bureau Ins. Co.*, [232 Ark. 841, 341 S.W.2d 36 (1960)]; *Affiliated Foods Southwest, Inc. v. Moran*, [322 Ark. 808, 912 S.W.2d 8 (1995)]. For example, [the court has] held that nightmarish red tape, an abrupt attitude evidenced by an insurance representative about higher premium costs following cancellation of a group policy, and confusion over the referral process did not amount to bad faith. *See American Health Care Providers v. O'Brien*, [318 Ark. 438, 886 S.W.2d 588 (1994)]. Nor did the fact that an insurance company waited three months to investigate a claim. *See Reynolds v. Shelter Mut. Ins. Co.*, 313 Ark. 145, 852 S.W.2d 799 (1993).
>
> Examples of cases where [the court has] found substantial evidence of bad faith include where an insurance agent lied by stating there was no insurance coverage (*Southern Farm v. Allen*, *supra*); aggressive, abusive, and coercive conduct by a claims representative, which included conversion of the insured's wrecked car; (*Viking Insurance Co. v. Jester*, 310 Ark. 317, 836 S.W.2d 371 (1992)); and where a carrier intentionally altered insurance records to avoid a bad risk (*Employers Equitable Life Ins. Co. v. Williams*, 282 Ark. 29, 665 S.W.2d 873 (1984)).

*State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 58, 991 S.W.2d 555, 560-61 (1999).

State Farm argues that Sims cannot show any evidence that its handling of her claim involved any affirmative act of dishonesty, oppression, or malice. At best, it argues, this case involves a good-faith dispute over the value of Sims's claim.

Sims argues that her claim file included a life care and vocational plan performed by a vocational expert, which indicated that Sims would most likely need $214,559.95 in future medical care and would suffer loss of earning capacity between $111,173.58 and $435,697, 39. She contends that Ripley's assignment of value to these aspects of her claim represented a small fraction of what the reports actually showed. She maintains that Ripley's deposition testimony revealed that he lacked an evidentiary basis that would justify discounting her medical expenses and loss of earning capacity. Sims further argues that a May 3, 2013, entry by Rodriguez in the claim file erroneously stated that most of her medical expenses were in 2008—thus failing to acknowledge that three-quarters of her treatment dates occurred after 2008. She further maintains that Rodriguez claims to have based his evaluation of her claim on his sense of what a reasonable jury would award without doing any real research into pertinent jury verdicts. Sims contends that a lack of ongoing treatment and a reference to other jury verdicts were the only grounds State Farm gave to justify its $25,000 offer.

Viewing the evidence in the light most favorable to Sims, she has not shown that State Farm has committed any affirmative act of dishonesty, oppression, or malice. Again, "a mistake on an insurance carrier's part or negligence or confusion or bad judgment will not suffice to substantiate the tort of bad faith." *Swaim*, 338 Ark. at 58, 991 S.W.2d at 560; *see Moore v. Shelter Mut. Ins. Co.*, No. CIV. 13-2092, 2014 WL 3547020, at *2 (W.D. Ark. July 17, 2014) ("While the manner in which Plaintiff's claim was handled was unfortunate, poor business policies alone do not meet the threshold of bad faith."); *Ark-La-Tex Well Serv., LLC v. Bituminous Cas. Corp.*, Case No. 09-CV-4135, 2010 WL 5169072, at *2 (W.D. Ark. Dec. 14, 2010) ("Without any evidence of malice or ill will on the part of Bituminous, its failure to pay the Well Service's $650,000 demand does not

amount to the tort of bad faith."). Sims has not identified a malicious act independent of the actual decision to deny her claim for the policy limits. *Unum Life Ins. Co. of America v. Edwards*, 362 Ark. 624, 630, 210 S.W.3d 84, 89 (2005). The evidence that Sims has presented "reveals the essence of her claim to be that [State Farm's denial of her claim for the policy limits] is itself wrongful." *Id.* Thus, her evidence tends to show that State Farm breached the insurance contract, not that it is guilty of the tort of bad faith.

Sims argues that an insurer can commit bad faith by "turning a blind eye to clear evidence" because "a decision to ignore evidence" is more than "a mere failure to investigate." *Cincinnati Life Ins. Co v. Mickles*, 85 Ark. App. 188, 201, 203, 148 S.W.3d 768, 777, 778 (2004). Sims's argument disregards the substantial evidence of affirmative dishonesty that was presented in the *Mickles* case. *Mickles* involved life insurance sold by persons sent as enrollers to various places around the country for the purpose of soliciting applications. AON Risk Services acted as agent for Cincinnati Life and hired the enrollers. Mickles made nine applications for life insurance, six on her children and three on her grandchildren. One of the applications was for a son who was married and did not live with her. The enroller nevertheless assured Mickles that the son qualified for a policy and completed the application. Sometime after Mickles signed the application, someone added to the application that the son was a full-time student, which was false. Cincinnati Life accepted the policy and accepted the premiums. The son died, and a claim against the policy was submitted.

The person who enrolled Mickles identified himself as James Foster, and the application was signed by James Foster of AON as "agent witness." When Foster's deposition was taken, he acknowledged that his signature appeared as witnessing agent on the application, but he said that he had never been to Little Rock and had not taken the application. Mickles, upon reviewing

Foster's videotaped deposition, confirmed that he was not the person who had taken her application. The parties then stipulated that the application was probably taken by one of two individuals, neither of whom was licensed in Arkansas as an insurance agent. During the course of the investigation of the claim, Cincinnati Life sent a questionnaire to Foster, who lied in response, stating that he had completed the application at Mickles's workplace. He did not, however, answer the question as to whether Mickles had told him that the son was a full-time student. Cincinnati Life subsequently discovered that Foster had lied about being the enroller but did no further investigation. Furthermore, Cincinnati Life persisted in claiming, even to the Arkansas Insurance Department, that there were two misrepresentations on the application, even when it was evident that the application had been altered by its own agent. As this summary of the evidence shows, the insurance company in *Mickles* was not simply guilty of turning a blind eye to evidence that supported the insured's claim; rather, it turned a blind eye to affirmative acts of dishonesty by its own agents both in the application process and in the claims handling process. *Mickles* does not support Sims's argument that an insurance company's failure to review or to credit information in the claims file suffices to establish a bad faith claim.

Turning to Sims's claim under the Arkansas Deceptive Trade Practices Act, she argues that State Farm willfully made material misstatements concerning the information that she submitted, ignored evidence of impairment and loss of earning capacity, and made claim decisions unsupported by any evidentiary basis.

> The Arkansas Deceptive Trade Practices Act provides a private right of action to "any person" who suffers actual damage or injury as a result of a violation of the Act. *See* Ark. Code Ann. § 4-88-113(f). The Act prohibits a variety of listed practices, including "[k]nowingly making a false representation as to the . . . sponsorship . . . of goods or services" and a catchall provision prohibiting "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."

8

> Ark. Code Ann. § 4-88-107(a)(1), (a)(10). The elements of such a cause of action are (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act. *See* Ark. Code Ann. § 4-88-113(f). A private cause of action does not arise absent a showing of both a violation and resultant damages. *Wallis v. Ford Motor Co.,* 362 Ark. 317, 208 S.W.3d 153 (2005).

*Skalla v. Canepari*, 2013 Ark. 415, at 14, 430 S.W.3d 72, 81-82 (2013). However, the safe-harbor provision of the Act precludes insurance carriers from being subject to suits brought under the Act. Specifically, the Act "does not apply to: * * * [a]ctions or transactions permitted under laws administered by the Insurance Commissioner . . . unless a director of th[at] division[] specifically requests the Attorney General to implement the powers of this chapter[.]" Ark. Code Ann. § 4-88-101(3).

> As this Court has previously stated, the insurance activity exception "essentially includes all insurance activity in the State of Arkansas," permissible or not. *Jones v. Unum Life Ins. Co. of Am.*, 4:06CV00547, 2006 WL 3462130, at *3 (E.D. Ark. Nov. 29, 2006); *see also Kirby v. United Am. Ins. Co.*, 4:08CV00338 JLH, 2010 WL 961723, at *1 (E.D. Ark. Mar.15, 2010) (finding that the ADTPA did not apply to an insurance transaction even if the insurance policy was misrepresented to the consumer); *Robertson v. White*, 633 F. Supp. 954, 978 (W.D. Ark. 1986) (finding that the Consumer Protection Act, which preceded the ADTPA, "remove[d] from the purview of the Consumer Protection Act" a transaction governed by the state securities commissioner).

*Williams v. State Farm Mut. Auto. Ins. Co.*, Case No. 5:10CV00032 JLH, 2010 WL 2573196, at *4 (E.D. Ark. June 22, 2010).

Sims points to *Willsey v. Shelter Mutual Insurance Company*, Case No. 2:12-CV-2320-RTD, 2013 WL 4453122 (W.D. Ark. Aug. 16, 2013), which rejected the holdings cited above and held that unfair claims practices are not excluded from the purview of the Arkansas Deceptive Trade Practices Act by Arkansas Code Annotated § 4-88-101(3) because such acts are prohibited by the Arkansas Insurance Trade Practices Act. *Id*. at *3; *see* Ark. Code Ann. §§ 23-66-205 and 206. *Willsey* based

9

its holding on "[t]he plain meaning of the safe harbor provision." 2013 WL 4453122, at *3. But the plain language of the safe harbor provision extends to "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner," Ark. Code Ann. § 4-88-101(3), and the action of adjusting a claim by an insurance company is an action permitted under laws administered by the Insurance Commissioner. Moreover, as this Court explained in *Williams*:

> If the Court were to follow the plaintiffs' argument to its logical conclusion, the ADTPA would apply to any action or transaction alleged to be unlawful, which would render the exceptions listed in section 4-88-101 meaningless and would doubtless run afoul of the statutory scheme created by the Arkansas General Assembly. Furthermore, the Arkansas Insurance Code includes a Trade Practices Act that prohibits dishonest insurance practices, Ark. Code Ann. § 23-66-201 *et seq.*, but the Arkansas General Assembly has expressly stated that the Trade Practices Act in the insurance code does not create a private right of action. Ark. Code Ann. § 23-66-202(b). To hold that insurance carriers are subject to private causes of action brought pursuant to the ADTPA would be contrary to the statutory scheme established by the Arkansas General Assembly.

*Williams*, 2010 WL 2573196, at *4.

In any event, viewing the evidence in the light most favorable to Sims, her ADTPA claim fails on the merits for much the same reason that her bad faith claim does not survive summary judgment. Sims has not shown evidence that State Farm engaged in "a deceptive consumer-oriented act or practice." *Skalla*, 2013 Ark. 415, at 14, 430 S.W.3d at 82. The facts alleged by Sims constitute, "if anything, an ordinary breach of contract claim that does not rise to the level of violating the Arkansas Deceptive Trade Practices Act." *Butler & Cook, Inc. v. CenterPoint Energy Gas Transmission Co.*, No. 2:12-2107, 2012 WL 4195906, at *5 (W.D. Ark. Sept. 18, 2012) (citing *CEI Eng'g Assocs., Inc. v. Elder Constr. Co.*, 2009 Ark. App. 259, 306 S.W.3d 447 (Ark. App. 2009) (holding that the trial court erred by not compelling arbitration of plaintiff's ADTPA claim because the true character of the claim was for breach of contract.)). "When the performance of a

duty under a contract is contemplated, the nonperformance of that duty is most typically known as a breach." *Id.* (citing *Taylor v. George,* 92 Ark. App. 264, 212 S.W.3d 17 (2005)).

## CONCLUSION

For the reasons set forth above, State Farm's motion for summary judgment on Sims's bad faith and ADTPA claims is GRANTED. Document #54.

IT IS SO ORDERED this 9th day of June, 2015.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE